MARSHALL v. The ADRIATIC. See Case No. 89.

## Case No. 9,124.

### MARSHALL v. BALTIMORE & O. R. CO.

[Taney, 204.] [1]

Circuit Court, D. Maryland. Nov. Term. 1852. [2]

CONTRACTS — LOBBYING — POLICY OF LAW — CONCEALMENT OF PURPOSE IN ADVOCATING.

1. No action will lie on a contract to pay for services rendered in obtaining the passage of a law through the legislature, by what is commonly termed lobby members, the same being against the policy of the law, and void.

2. Such a contract is against the policy of the law, and void, if, at the time it was made, the parties agreed to conceal from the members of the legislature the fact, that the plaintiff was employed by the defendant, as its agent, to advocate the passage of the law it desired to obtain, and was to receive a compensation in money for his services, in case the law was passed

by the legislature, at the session referred to in the agreement.

3. If there was no actual agreement to practise such concealment, yet, the plaintiff will not be entitled to recover, if he did conceal from the members of the legislature, when advocating the passage of the law, that he was acting as an agent for the defendant, and was to receive a compensation in money, in case the law passed.

This action was instituted the 22d of August 1850, on an alleged agreement by the defendant, to pay the plaintiff [Alexander J. Marshall] the sum of fifty thousand dollars, in six per cent. bonds of the defendant, at their par value. This sum was claimed under the said agreement, as a compensation for services rendered by the plaintiff, in procuring from the legislature of Virginia, the right of way for the defendant's railroad through that state.

By agreement all errors in pleading were waived, but the plaintiff was to furnish the court, before the day of trial, a statement of his grounds of claim, and the defendant was, in like manner, to furnish a statement of its grounds of defence.

The grounds of claim furnished by the plaintiff were as follows: The plaintiff, in pursuance of the agreement of counsel heretofore made, specifies as the grounds of his claim:

I. 1st. The contract between the plaintiff and defendant for the payment and delivery to the plaintiff of the sum of fifty thousand dollars, in the six per cent. bonds of the defendant, at their par value, upon the terms and considerations specified, and to be found in the resolutions passed at a meeting of the committee of correspondence appointed to take charge of the general subject in regard to measures for obtaining the right of way through the states of Virginia and Pennsylvania, on the 12th of December 1846. And the further resolution of the said committee, passed on the 18th of January 1847; and in the letter of Louis McLane to the plaintiff, dated the 18th of January 1847, and in the letters of the plaintiff to the said Louis McLane, of the 9th of February 1847, and the reply of said Louis McLane thereto, of the 11th of February 1847. 2d. The performance of that contract, by plaintiff's attendance at Richmond, during the session of the legislature of Virginia of 1846–1847, in order to superintend and further any application, or other proceeding, to obtain the right of way through the state of Virginia, on behalf of the defendant, and to take all prompt measures for that purpose. 3d. The happening of the contingencies whereon said compensation was payable, by the passage of the law by the legislature of Virginia of the 6th March 1847, and the acceptance of said law, by the acting under it by the defendant; by which law, upon the election of the city of Wheeling, not to pay to the company the difference of cost between the Grave creek and Fish creek routes, as specified in first section of said act, or upon the failure of said city to

---

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

[2] [Affirmed in 16 How. (57 U. S.) 314.]

agree to pay such difference of cost, according to said first section, the defendant was authorized to extend its road through Virginia, to a point on the Ohio river, as low down as Fish creek.

II. The contract to be collected from all the correspondence between the plaintiff and Louis McLane, president of the Baltimore and Ohio Railroad Company, between the 12th of December 1846 and the 6th of March 1847, touching the employment and agency of the plaintiff by the defendant, in superintending and furthering the applications and proceedings, by or on behalf of the defendant, to obtain the right of way for the defendant through the state of Virginia, to the Ohio river; all which correspondence is now in the possession and knowledge of the defendant.

III. An implied contract for reasonable compensation for work and labor, care and diligence applied, and money paid, laid out and expended, by the plaintiff for the defendant, at its request, in furthering and superintending, as its agent or counsel, the proceedings before the legislature of Virginia, during the session of 1846 and 1847, by or on behalf of defendant, to obtain the right of way through Virginia, to the Ohio river. On which three distinct grounds, the plaintiff rests his claim, and insists on a verdict in his favor.

The grounds of defence stated by the defendant were as follows:—The defendant in the above cause, having received notice of the plaintiff's grounds of claim, gives the following notice of defence: 1. That the agreement sought to be enforced by the plaintiff, admitting his ability to make it out by legal proof, to the extent of his pretensions, was an agreement contrary to the policy of the law, and which cannot be sustained. 2. Admitting the said agreement to be a valid one, which the courts would enforce, yet the plaintiff is not entitled to recover, because he failed to accomplish the object for which it was entered into. 3. That the law of Virginia, which was accepted by the defendant, after it had been modified by the waiver of the city of Wheeling, as mentioned in the plaintiff's notice, was not obtained through the efforts of the plaintiff, but against his strenuous opposition, and furnishes him no ground for his present claim. 4. That there was a final settlement between the plaintiff and defendant, after the passage of the Virginia law aforesaid, which concludes him in this behalf.

The resolution of the 12th December 1846, offered in evidence by the plaintiff, was as follows:

"Office of the Baltimore and Ohio Railroad Company, December 12, 1846. At a meeting of the committee of correspondence appointed to take charge of the general subject in regard to measures for obtaining the right of way through the states of Virginia and Pennsylvania, there were present Messrs. Har-

wood, Cooke, Hoffman and O'Donnell; the president also attended. On motion, it was resolved, that the president be and he is hereby authorized, in addition to the agent heretofore employed by the committee for the same purpose, to employ and make arrangements with other responsible persons, to attend at Richmond, during the present session of the legislature, in order to superintend and further any application, or other proceeding, to obtain the right of way through the state of Virginia, on behalf of this company, and to take all proper measures for that purpose. That he also be authorized to agree with such agent or agents, in case a law shall be obtained from the said legislature, during the present session, authorizing the company to extend their road through that state to a point on the Ohio river, as low down the river as Fishing creek, and the stockholders of this company shall afterwards accept such law as may be obtained, and determine to act under it; or in case a law should be passed authorizing the construction of a railroad from any point on the Ohio river, above the mouth of the Little Kanawha, and below the city of Wheeling, with authority to intersect with the present Baltimore and Ohio Railroad, and the stockholders of the Baltimore and Ohio Railroad Company shall determine to accept and adopt said law, or shall become the proprietors thereof, and prosecute their road according to its provisions; then, in either of the said cases, the president shall be and is authorized to pay to the agent or agents whom he may employ, in pursuance of this resolution, the sum of fifty thousand dollars, in the six. per cent. bonds of this company, at their par value, and to be made payable in any time within the period of five years. Resolved, that it shall be stipulated in the agreement of said agent or agents, employed pursuant to this resolution, and as a condition thereof, that if no such law as aforesaid shall pass, or if any law that may be passed shall not be accepted or adopted, or used by the stockholders, the said agents shall not be entitled to receive any compensation whatever for the service they may render in the premises, or for any expense they may incur in obtaining such law, or otherwise. James Harwood, William Cooke, Samuel Hoffman, Columbus O'Donnell, Louis McLane, President."

The above resolution was modified, on the 18th January 1847, as follows:

"The committee of correspondence in regard to procuring the right of way through Virginia, met this 18th day of January 1847, at the house of Judge Harwood, the chairman; present, Mr. Harwood, Mr. Cooke and Mr. O'Donnell; the president also attended. A letter from A. J. Marshall, the company's agent at Richmond, dated the 16th instant, was submitted to the committee; on motion, it was unanimously resolved, that the right of Mr. Marshall to the compensation under the existing contract, shall attach, upon the

passage of a law at the present session of the legislature, giving the right of way to Parkersburg or to Fishing creek, either to the Baltimore and Ohio Railroad Company, or to an independent company; provided this company accept the one, and adopt and act under the other, as contemplated by the contract. James Harwood, William Cooke, Columbus O'Donnell.

"January 19, 1847. Mr. Hoffman not having been present at the meeting yesterday, but coming to the railroad office to-day, and having read the aforegoing minute, approved the same. Samuel Hoffman."

A further modification of the resolution is contained in the following letter of the plaintiff, to Louis McLane, of the 9th of February 1847, and the reply of McLane thereto, by order of the company, dated 11th February 1847:

"9th February. Dear Sir: Sheffy reported, this morning, a route to Wheeling different from the prescribed route, but utterly unacceptable; you will not, in fact, be allowed to touch the Ohio at Fish creek; but if a cheaper route can be pointed out (you not to judge of the cheapness), you are to be forced to take it. I heard the bill read only, and need only tell you Mr. Hunter says it is more objectionable than the present law; Mr. Green has promised to get a copy of the bill, and send it to you to-night. We anticipated, from the information given us, that the Wheeling compromise would have given you Fish creek as terminus; we had rallied our strength on Fishing creek and Hunter's compromise; we had taken ground that Fish creek would certainly defeat the road, as you could not accept it; parties were organized on this issue, and many who had voted against us before, had determined to vote with us on this issue; I think we should have carried it; many members wished to end this agitating question; it jostles and endangers every interest in the state. They would pass any reasonable law that would quiet this clamor, and at the same time would embody a fair concession to Wheeling; the extent to which a concession to Wheeling would be compatible with the acceptance of the law, was the point at issue; we insisted that a law making Fish creek the terminus would be rejected, and for this reason we could have carried Fishing creek. In this state of things, we get the proceedings of your stockholders on Monday; their resolutions respond alone to the present laws; they emphatically reject them, and have no doubt that the 'prescribed route' to Wheeling will never do; at the same time, we get the 'American,' in which you are reported to say, you hope to get an acceptable terminus above Fishing creek. I have taken the ground, that this paper has mistaken and misrepresented you; I have no doubt, that a firm stand on your part, stating that Hunter's compromise would be accepted, and that no point higher up would be accepted,

would have settled this question by a decided vote; I do not believe, under the present state of our information, you could ever get Fish creek as a terminus. The argument of Wheeling, that you will go to that city, if you can do no better, is greatly strengthened; they say that all you require is a change of the 'prescribed' route, and an assurance that you can do no better. I fear Sheffy's bill will be pressed to-morrow; if it is, I fear it will pass; it will be impossible to resist the belief, that if Virginia is firm, and will modify the route, you will go to Wheeling. It is necessary you should speak plain and speak at once; say you cannot extend your road, unless permitted to strike the Ohio, at least as low as Fishing creek. If you will accept Fish creek, and will be positive that you will go no higher, I think you can get it; this, of course, would cut me out; but that cannot be helped. I wish to get an ultimatum from you, for I assure you, you will be confined to Wheeling otherwise. Please write to Mr. Hunter; his letter can be exhibited; take a firm stand, and we may yet retrieve the day; even if the bill gets to the senate, it may be amended. I am, dear sir. with great respect, your obedient servant, &c., A. J. Marshall."

"Baltimore, February • 11th, 1847. A. J. Marshall, Esq., Dear Sir: Your letter of the 9th reached me at too late an hour to afford me an opportunity of consulting the committee, and without that opportunity I could not give the reply I wished. It would be difficult for me to be more explicit than I have been in regard to Fish creek, and I am sorry that you, or any one else, should require any more than the resolution unanimously adopted by the stockholders. That resolution is not confined, as your letters seem to suppose, to the law; it, on the contrary, does, and was intended most explicitly, to reject in toto the route prescribed in the present law; and, as Fish creek could only be approached by that route, or some part of it, as certified in Mr. L.'s letter, forwarded to Mr. Hunter, that point is effectually and necessarily excluded. I am still free to assure you that, in the opinion of the committee, the stockholders will not, under any circumstances, construct their road to Wheeling, without the privilege of a terminus at some point on the Ohio river, not higher up than Fishing creek; and it is absolutely certain, that the compromise proposed by Sheffy will, under no circumstances, or for any inducement whatever, be assented to; to this effect I wrote to-day to Mr. Hunter. At the same time. that I am free to give you these assurances, the committee, after full reflection, are unwilling to assume the responsibility of preventing, by their act, the passage of a law, if nothing better can be had, tendering to the stockholders the option of rejecting or accepting it, which would confine their main stem to Fish creek by such route as the company

might select. While the committee are persuaded that such a law would not be accepted by the stockholders, they know that there are a large number of them who believe that, if such a law should now be tendered to them, they would be thereby introduced into the state, and could hold it under consideration, if for nothing more, for the chance of getting it amended at another session, and we could not, therefore, be responsible for depriving them of that option. In this crisis, if, after the utmost exertion, nothing better can be done, if it were possible to pass Mr. Hunter's substitute, with Fish creek instead of Fishing creek, we would not undertake to prevent the passage of such a law; we would then refer the whole question to the stockholders; and I am authorized to say that, everything else failing, if such a law as is indicated pass, and the stockholders adopt it, and act under it, in the manner contemplated by the contract, your compensation shall apply to that, as to any other aspect of the case. The committee do this from the sense they entertain of the labor and exertions you have already made, and believing that the fruit of these, and your further exertions, if in a form to be acceptable to the stockholders, should inure to your benefit. They do not suppose this was needed to insure your continued exertions in the present crisis. It ought to be clearly understood, however, that Sheffy's compromise can, in no event, be brought within this view; and as it regards that, the committee are willing to be responsible for preventing even its tender to the stockholders; that, or anything like it, is wholly impracticable; it is worse even than the present law; it would involve the employment of Knight's route, under even greater disadvantages, and would be promptly and forever rejected. I am, dear sir, very respectfully, your obedient servant, Louis McLane."

"February 11th, 1847. The committee met this day in the president's office; present, Messrs. Harwood, Hoffman, Cooke and O'Donnell. A letter from A. J. Marshall, dated the 9th inst., asking for the company's ultimatum, was submitted by the president; the same being considered, the president prepared an answer, embodying the views of the committee, which being read, was unanimously approved and adopted, and the president was ordered to send the same to Mr. Marshall. The foregoing is the letter referred to. James Harwood, William Cooke, Samuel Hoffman, Columbus O'Donnell."

In addition to the foregoing evidence, offered by the plaintiff, a great deal of testimony was offered by him to establish the performance of the conditions on which he was to be entitled to the compensation claimed.

The defendants, with a view to establish the illegality of the contract, as against public policy, offered in evidence a letter of the plaintiff, dated 17th November 1846, together with an inclosed document (the reading of which latter was objected to by the plaintiff, but permitted by the court); and also two letters from Louis McLane to the plaintiff, of the 25th November and 12th December 1846, as follows:

Letter of A. J. Marshall:

"Warrenton, November 17, 1846. Dear Sir: In an interview with you, a few days since, I promised to submit, in writing, a plan by which I thought your much desired 'right of way,' through this state, might be procured from our legislature; I herewith inclose my views on that subject, and shall respectfully await your reply. In offering myself as the agent of your company, to manage so delicate and important a trust, I am aware I lack that commanding reputation which, of itself, would point me out as best qualified for such a post; of my qualification and fitness, it is not for me to speak, and in consequence of the absolute secrecy demanded, I cannot seek testimonials of my capacity, lest I should incite inquiry. If your judgment approves my scheme, it is probable, you might get satisfactory information respecting me, by a cautious conversation with John M. Gordon, A. B. Gordon, Dr. John H. Thomas or Joseph C. Wilson, all of your city; without impropriety. I may say for myself, I have had considerable experience as a lobby-member before the legislature of Virginia; for several winters past, I have been before that body with difficult and important measures affecting the improvement of this region of country, and I think I understand the character and component material of that honorable body. I shall have to spend six or eight weeks in Richmond, next winter, to procure important amendments to the charter of the Rappahannock Company; this will furnish reason for my presence in Richmond. There is an effort in progress to divide our county, to which we, of Warrenton, are violently hostile; this affords another reason for myself, and also for one or two other agents, to remain in the city of Richmond, during the winter. Colonel Walden and myself are interested in large bodies of land in Western Virginia, near which the track of your railroad will pass; this is an ostensible reason for our active interference. I live in a range of country whose representation ought to be entirely disinterested on this question of 'the right of way;' notwithstanding which, I believe a plurality of our representatives have heretofore been in opposition; I know the influences that effected this, and am happy to say they will not exist next winter. Edward Broaddus, for many years a representative from Culpepper, a shrewd, intelligent man, influenced this result; Broaddus was a sort of protégé of the Richmond and James river Whigs, was distinguished and promoted by them, and habitually acts with them; his place is now filled by Slaughter, a personal friend of mine; I should have little fear to

carry this section of the state. The proposed plan best speaks for itself; if you think it feasible, there is no time to be lost; I hope to hear from you at your earliest leisure. With entire respect, I am your humble servant, &c., A. J. Marshall.

"I tax you with the postage, as I do not wish to be known as in correspondence."

Document accompanying the above:

"In explanation of the plan I wish to submit, it is necessary to indulge some latitude of remark on the causes which have heretofore thwarted the just pretensions of your company. Richmond city, the Petersburg, Richmond and Potomac Railroad, the James river canal and the Wheeling interest, acting in concert, have heretofore successfully combated 'the right of way;' these interests fall far short of a majority in the two branches of the Virginia legislature; there is no sufficient ground, in the numeric force of this antagonist interest, to discourage the hope of an eventual success. On an examination of their arguments, based either upon justice or expediency, I find nothing to challenge a conviction of right, or an assurance of high state policy; on the contrary, standing heretofore as a disinterested spectator of the struggle, I have condemned the emptiness and arrogance of their pretensions, and felt indignant at the success of their narrow, selfish and bigoted policy. I have observed no superiority of talent, no greater zeal or power of advocacy in the opposition, than in favor of 'the right of way.' The success of a cause before our legislature, having neither justice, greater expediency, stronger advocacy or greater numeric strength, is matter of just amazement to the defeated party. The elements of this success should be a subject of curious and deeply anxious investigation; for when the cause is known, a remedy or counteracting influence may be readily applied. I have no idea that any dishonorable means or appliances (further than log-rolling may be one) have been used to defeat the 'right of way.' As to log-rolling, I am sorry to say, it has grown to a system in our legislature; numbers openly avow and act on it, and never conceal their bargains, except when publicity would jeopard success; no delegation are more skilful or less scrupulous at this game than our western right-of-way men, so in that regard, there is a stand off. It seems to me, the great secret of this success, is the propinquity, the presence on the ground, of your opponents. The legislature sits in their midst; they exercise a vigilant, pressing, present out-of-door influence upon the members. If the capitol were located at Weston or Clarksburg, who would question success? The Richmond interest is ever present and ever pressing; her associates of the railroad and canal are at hand, and equally active; you have no counteracting influence, and hence the success and triumph of your opponents. If I am right in these views, your claims, resting alone on justice, sectional necessity, or even high state policy, will be urged in vain, and must become as mere sounding clamor in the hall, unless you meet your opponents with the weapons they use so successfully against yourselves; experience shows that something beyond what you have heretofore done, is necessary to success; and in this necessity, the plan I have to submit, has its origin. The mass of the members in our legislature, are a thoughtless, careless, light-hearted body of men, who come there for the per diem, and to spend the per diem; for a brief space, they feel the importance and responsibility of their position; they soon, however, engage in idle pleasures, and on all questions disconnected with their immediate constituents, they become as wax, to be moulded by the most pressing influences. You need the vote of this careless mass, and if you adopt efficient means, you can obtain it; I never saw a class of men more eminently kind and social in their intercourse; through those qualities they may be approached and influenced to do anything not positively wrong, or which will not affect, prejudicially, their immediate constituency. On this question of the 'right of way,' a decided majority of the members can vote either way, without fear of their constituents; on this question, therefore, I consider the most active influences will ever be the most successful. Before you can succeed, in my judgment, you must reinforce the 'right-of-way' members of the house, with an active, interested, well-organized influence about the house; you must inspire your agents with an earnest, nay, an anxious, wish for success; the rich reward of their labors must depend on success; give them nothing if they fail; endow them richly if they succeed. This is, in brief space, the outline of my plan; reason and justice are with you; an enlarged expediency favors your claim; you have able advocates, and the best of the argument; yet with all these advantages, you have been defeated; I think I have pointed out the cause. Your opponents better understand the nature of the tribunal before which this vast interest is brought; they act on individuals of the body out of doors, and in their chambers; your adversaries are all on the spot, and hover around the careless arbiters of the question, in vigilant and efficient activity; the contest, as now waged, is most unequal. My plan would aim to place the 'right-of-way' members on an equality with their adversaries, by sending down a corps of agents, stimulated to an active partisanship, by the strong lure of a high profit. In considering the details of the plan, I would suggest, that all practicable secrecy is desirable; it strikes me, the company should have, or know, but one agent in the matter, and let that agent select the sub-agents, from such quarters and classes, and in such numbers, as his discreet observation may dictate. I contemplate the use of no improper means or appliances in the attainment of your purpose; my scheme

is to surround the legislature with respectable and influential agents, whose persuasive arguments may influence the members to do you a naked act of justice; this is all. I require secrecy, from motives of policy alone, because an open agency would furnish ground of suspicion and unmerited invective, and might weaken the impression we seek to make. In regard to the cost of all this, it must necessarily be great; the sub-agency must be extensive, and of first influence and character; all your agents must be inspired by an active zeal and determined purpose of success; this can only be accomplished for you, by offers of high contingent compensation. I will illustrate this point by a single example. Were I to become your agent, on my plan, I should like to have the services of Major Charles Hunton, of this county; Hunton, for many years, was a member of our state senate; his last year of service was as president of that body. He is an unpretending man, of good understanding and excellent address; he is a great favorite with his own party (Dem.), and universally esteemed as a gentleman of highest character; he is in moderate circumstances, with a large family. I have no doubt, if 1 would bear his expenses, and secure him a contingent $1000, he would spend the winter in Richmond, and do good service; but if I could offer him $2000, it would become an object of great solicitude; it would pay all his debts, and smooth the path of an advancing old age; two thousand dollars would stimulate his utmost energies. If I am able to offer such inducements, I should have great confidence of success; under this plan you pay nothing, unless a law be passed which your company will accept. Of what value would such a law be to you? Measure this value, and let your own interests, in view of the high stake you play for, fix the price. There is no use in sending a boy on a man's errand. A low offer, and that contingent, is bad judgment; high service can't be had at a low bid. I have surveyed the difficulties of this undertaking, and think they may be surmounted. The cash outlay for my own expenses, and those of the sub-agents, would be heavy; 1 know the effective service of such agents as I would employ, cannot be had, except on a heavy contingent; taking all things into view, I should not like to undertake the business, on such terms, unless provided with a contingent fund of at least $50,000, secured to my order, on the passage of a law, and its acceptance by your company. If the foregoing views are deemed worthy of consideration, I hold myself in readiness to meet any call in that behalf that may be made upon me. Respectfully, &c., A. J. Marshall."

Reply of Louis McLane:

"Baltimore, Nov. 25, 1846. Dear Sir: I duly received your letter, and its inclosure, of the 17th instant, and would have acknowledged it sooner, but that I waited in the hope of being more definite in my reply.

The subject is one, however, in which it is not easy to act promptly. I would be quite unwilling to act definitely, either to accept, or modify or reject your proposition, upon my individual responsibility, and the necessity of consultation with those whom I must, in some shape or other, consult, requires both caution and time; for the present, therefore, I propose only to acknowledge the receipt of your communication, and to assure you I will not necessarily lose time in obtaining a decision upon the subject to which it relates. It is possible, too, that I may find it necessary to ask you to repeat your visit to Baltimore. Meantime, I remain, dear sir, respectfully, your obedient servant, Louis McLane.

"A. J. Marshall, Esq., Warrenton, Virginia."

Second letter from the same:

"Baltimore, December 12, 1846. Dear Sir: I am happy to inform you that I am now prepared to close an arrangement with you, upon the basis of your communication of the 17th of November; but as it will be necessary to make some personal explanations, and to acquaint you, more fully than I can do by letter, with our views, I must ask you to visit Baltimore, as early as may be practicable. I am, dear sir, very respectfully, your obedient servant, Louis McLane.

"A. J. Marshall, &c."

The plaintiff requested the following instructions to the jury: "Plaintiff's prayers: The plaintiff, by his counsel, prays the court to instruct the jury as follows: (1) That there is nothing in the terms or provisions of the agreement, embraced in the resolutions of the committee of correspondence, dated 12th December 1846, offered in evidence, which renders the same void, on grounds of public policy. (2) That the plaintiff is not precluded from recovering, under the agreement aforesaid, dated 12th December 1846, as modified by the agreement stated in the letter of 11th February 1847, by reason merely of the second proviso contained in the first section of the act of 6th March 1847, which has been offered in evidence, provided the jury shall find that the route, entering the ravine of the Ohio river at the mouth of Fish creek, and running so as to pass from a point in the ravine of Buffalo creek, at or near the mouth of Pile's fork, to a depot to be established by defendant on the northern side of Wheeling creek, in the city of Wheeling, upon minute estimates, made in the manner and on the basis prescribed in said act, and made after full examination and instrumental surveys of the feasible or practicable routes, appeared to be the cheapest upon which to construct, maintain and work said railroad; and provided they shall also find that the city of Wheeling did not agree to pay the difference of cost, as specified in said act, but on the contrary, renounced the right to do so, as early as the 10th of July 1847; and

provided they shall also find that the said act was accepted by the stockholders of the defendant, as a part of its charter, on the 25th August 1847. (3) Upon the evidence aforesaid, the plaintiff prays the court to instruct the jury, that if they find the contract contained in the resolution of the committee of correspondence of the 12th of December 1846, and in the resolution of the committee of correspondence of the 18th of January 1847, and in the letter of Louis McLane of the 11th February 1847, aforesaid, to have been made with the plaintiff by the defendant; and also, that the act of Virginia of the 6th of March 1847 was passed at the session of the legislature of Virginia for 1846–1847, in the contract mentioned; and also, that the Baltimore and Ohio railroad, by the cheapest route to the city of Wheeling, entering the ravine of the Ohio at or north of Grave creek, was ascertained, by such estimates as the law prescribed, to be more costly to construct, maintain and work, than said road would be by the route passing into the ravine of the Ohio at or near the mouth of Fish creek, and then to the city of Wheeling, and that the difference of said probable cost was then, in like manner, ascertained; that the defendant accepted the said law, within six months from the passage thereof; and also, that when the difference of probable cost between said two routes was ascertained according to said act, the city of Wheeling did not agree to pay to the defendant such difference of cost by the time specified in said act; and that the plaintiff did attend at Richmond during the session aforesaid, and did then and there superintend and further the applications and other proceedings to obtain the right of way through the state of Virginia, on behalf of the defendant —then the plaintiff is entitled to recover, on the special contract contained in the instrument aforesaid, the value of the contingent compensation therein stipulated."

The defendants requested the following instructions to the jury: "Defendants' prayers: (1) The defendants, by their counsel, prayed the court to instruct the jury that the plaintiff was not entitled to recover, because the contract stipulated for the payment of a contingent fee of fifty thousand dollars, in the event of obtaining from the legislature of Virginia, such a law as is described therein, was against public policy and void. (2) That if the jury shall believe that it was agreed between the parties to the said contract that the same should be kept secret, either in the terms of it, or otherwise, from the legislature of Virginia, or the public, such contract, if otherwise proper and legal, was invalid, as against public policy, and the plaintiff is not entitled to recover. (3) If the jury find that the special contract offered in evidence by the plaintiff, was proposed to be entered into by the plaintiff, from the reasons and motives, and to be executed by him, in the way suggested in his communica-

tion of the 17th November, and its inclosure, offered in evidence by the defendants (if the jury shall find that such communication was so made by plaintiff), and if they shall find that the contract aforesaid was entered into accordingly, and that said contract, or plaintiff's agency under it, was not made known to the legislature of Virginia, but in fact concealed, that then said contract was illegal and void, upon grounds of public policy. (4) The contract between the plaintiff and defendants of 12th December 1846, looked to the obtaining of a law authorizing the defendants to extend their road through the state of Virginia to a point on the Ohio river, as low down the river as Fishing creek, which law should be afterwards accepted by the defendants, with a determination to act under it, or to the incorporation of an independent company, which the defendants should determine to accept and adopt, or of whose charter they should become the proprietors, authorizing the construction of a railroad from any point on the Ohio river, between the mouth of Little Kanawha and Wheeling, and that no such law having been obtained, the plaintiff is not entitled to recover. (5) That the modified contract of the 11th of February, looked to the obtaining of the passage of Hunter's substitute, with the adoption of Fish creek instead of Fishing creek as the point of striking the Ohio; that the law which was passed on the 6th of March 1847, was a law which did not, in its terms or effect, fulfil the stipulations of the modified agreement of February 11, 1847. (6) That the acceptance of the law of March 6, 1847, by the defendants, even supposing it to be substantially the same as Hunter's substitute, did not entitle the plaintiff to recover, unless the jury should believe that such law was obtained through his agency, under the agreement with the defendants. (7) That even if the jury should believe that the law of March 6, 1847, was obtained through the plaintiff's agency, the plaintiff is not entitled to recover, if they shall believe that it was accepted by the defendants, in consequence of the waiver by the city of Wheeling of the privileges accorded to it therein, and the stipulations contained in the agreement between the city of Wheeling and the defendants of March 6, 1847. (8) That the modified agreement of February 11, 1847, which made Hunter's substitute, modified as stated in the foregoing prayer, the standard of the law which was to be obtained, to entitle the plaintiff to the stipulated compensation, made it necessary that such law should give to the defendants the absolute right to approach the city of Wheeling by way of Fish creek; should release them from the necessity of continuing their road to Wheeling, unless the city should within one year, or the citizens of Ohio county should, in the same time, subscribe one million dollars to the stock of the defendants; should enable the defendants to open

and bring into use, as they progressed, the sections of their road as they were successively finished; and should authorize the defendants to charge in proportion to distance, upon passengers and goods taken from Baltimore to Wheeling, should the road be continued to the latter place; while the law that was actually passed made it the right of the defendants to take the Fish creek route, depend upon its being the cheapest, and even then placed the defendants' right to go to Fish creek, at the option of the city of Wheeling; made it imperative that Wheeling should be the terminus of the road, without any subscription on the part of herself or others; prevented the opening of any portion of her road west of Monongahela, until the whole road could be opened to Wheeling; and obliged the defendants to charge no more for passengers and tonnage to Wheeling, than they charge to a point five miles from the river; and that before the defendants accepted the law thus differing from that referred to in the modified agreement of February 11, 1847, the city of Wheeling waived its control of the route, leaving it to depend upon its comparative cost, agreed to subscribe five hundred thousand dollars to the stock of the defendants, and provide a depot for the defendants, at the terminus of the road; and that the adoption and acceptance of the law of March 6, 1847, thus differing from Hunter's substitute, and induced by the waiver and stipulation of Wheeling already mentioned and action under it; was not such an acceptance, adoption and action as entitled the plaintiff to recover. (9) That if the jury shall believe that the plaintiff received from the defendants the six hundred dollars given in evidence, in full discharge of his claims for compensation, under the agreement in question, then the plaintiff is not entitled to recover."

Wm. Schley and H. W. Davies, for plaintiff.

R. Johnson and J. H. B. Latrobe, for defendants.

TANEY, Circuit Justice, held: 1. If, at the time the special contract was made, upon which this suit is brought, it was understood between the parties, that the services of the plaintiff were to be of the character and description set forth in his letter to the president of the railroad company, dated November 17, 1846, and the paper therein inclosed; and that, in consideration of the contingent compensation mentioned in the contract, he was to use the means and influences proposed in his letter and the accompanying paper, for the purpose of obtaining the passage of the law mentioned in the agreement; the contract is against the policy of the law, and no action can be maintained upon it.

2. If there was no agreement between the parties that the services of the plaintiff should be of the character and description

mentioned in his letter and communication referred to in the preceding instruction, yet the contract is against the policy of the law, and void, if, at the time it was made, the parties agreed to conceal from the members of the legislature of Virginia, the fact that the plaintiff was employed by the defendants, as their agent, to advocate the passage of the law they desired to obtain, and was to receive a compensation in money for his services, in case the law was passed by the legislature, at the session referred to in the agreement.

3. If there was no actual agreement to practise such concealment, yet he is not entitled to recover, if he did conceal from the members of the legislature, when advocating the passage of the law, that he was acting as agent for the defendants, and was to receive a compensation in money in case the law passed.

4. If the contract was made upon a valid and legal consideration, the contingency has not happened upon which the sum of fifty thousand dollars was to be paid to the plaintiff, and the law passed by the legislature of Virginia being different, in material respects, from the one proposed to be obtained by the defendants, by the agreement of February 11, 1847, and the passage of which, by the terms of that contract, was made a condition precedent to the payment of the money.

Verdict and judgment for defendants.

Affirmed by the supreme court, in 16 How. [57 U. S.] 314.